# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: Condemnation By Sunoco Pipeline, L.P. of Permanent and Temporary Rights of Way for the Transportation of Ethane, Propane, Liquid Petroleum Gas, and other Petroleum Products in the Township of North Middleton, Cumberland County, Pennsylvania, over the Lands of R. Scott Martin and Pamela S. Martin | : : : : : : : : : : | No. 1979 C.D. 2015 |
| Appeal of: R. Scott Martin and Pamela S. Martin | : : : : | |
| In Re: Condemnation By Sunoco Pipeline, L.P. of Permanent and Temporary Rights of Way for the Transportation of Ethane, Propane, Liquid Petroleum Gas, and other Petroleum Products in the Township of North Middleton, Cumberland County, Pennsylvania, over the Lands of Douglas M. Fitzgerald and Lyndsey M. Fitzgerald | : : : : : : : : : : : : | No. 1980 C.D. 2015 |
| Appeal of: Douglas M. Fitzgerald and Lyndsey M. Fitzgerald | : : : | |
| In Re: Condemnation by Sunoco Pipeline, L.P. of Permanent and Temporary Rights of Way for the Transportation of Ethane, Propane, Liquid Petroleum Gas, and other Petroleum Products in the Township of North Middleton, Cumberland County, Pennsylvania, over the Lands of Harvey A. Nickey and Anna M. Nickey | : : : : : : : : : : : : | No. 1981 C.D. 2015<br>Argued: March 9, 2016 |
| Appeal of: Harvey A. Nickey and Anna M. Nickey | : : | |

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE ROBERT SIMPSON, Judge
HONORABLE P. KEVIN BROBSON, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE MICHAEL H. WOJCIK, Judge

**OPINION**
**BY JUDGE COHN JUBELIRER**                **FILED:  July 14, 2016**

R. Scott Martin and Pamela S. Martin, Douglas M. Fitzgerald and Lyndsey M. Fitzgerald, and Harvey A. Nickey and Anna M. Nickey (Condemnees) appeal from the September 29, 2015 Order of the Court of Common Pleas of Cumberland County (common pleas) that overruled Condemnees' Preliminary Objections to Declarations of Taking (Declarations) filed by Condemnor Sunoco Pipeline, L.P. (Sunoco) to facilitate construction of the phase of its Mariner East Project known as the Mariner East 2 pipeline.  Condemnees assert that common pleas erred when it overruled their Preliminary Objections because:  Sunoco's Declarations are barred under the doctrine of collateral estoppel by an earlier York County decision; the Mariner East 2 pipeline is not an intrastate pipeline subject to Pennsylvania Public Utility Commission (PUC) regulation; the Mariner East 2 pipeline does not provide PUC regulated service; and, no public need exists for the Mariner East 2 pipeline.  After careful review of the record, we find no error and therefore affirm.

## I.    PUC and FERC Jurisdiction, Sunoco and the Mariner East Project

Before we address the specific facts of these appeals and their merits, it will be helpful to provide some general background information on the nature of the interrelationships between Sunoco, PUC and Federal Energy Regulatory Commission (FERC), as well as the nature and history of the Mariner East Project.

## A.    Regulation of Public Utilities by PUC and by FERC

Section 1511(a)(2) of the Business Corporation Law of 1988[1] (BCL), 15 Pa. C.S. § 1511(a)(2),[2] provides that "public utility corporations" may exercise the power of eminent domain to condemn property for the transportation of, *inter alia*, natural gas and petroleum products.  Section 1103 of the BCL, 15 Pa. C.S. § 1103, defines public utility corporation as "[a]ny domestic or foreign corporation for profit that . . . is subject to regulation as a public utility by the [PUC] or an officer or agency of the United States . . . ."  FERC is an agency of the United States that may regulate an entity as a public utility under this section.

Jurisdiction over the certification and regulation of public utilities in the Commonwealth is vested in PUC through the Public Utility Code (Code).[3] However, simply being subject to PUC regulation is insufficient for an entity to have the power of eminent domain.  Section 1104 of the Code, 66 Pa. C.S. § 1104, requires that a public utility must possess a certificate of public convenience (CPC)

---

[1] 15 Pa. C.S. §§ 1101-9507.

[2] Section 1511(a)(2) of the BCL provides:

**§ 1511.  Additional powers of certain public utility corporations.**

**(a)** *General rule.--*

A public utility corporation shall, in addition to any other power of eminent domain conferred by any other statute, have the right to take, occupy and condemn property for one or more of the following principal purposes and ancillary purposes reasonably necessary or appropriate for the accomplishment of the principal purposes:

\* \* \*

   **(2)** The transportation of artificial or natural gas, electricity, petroleum or petroleum products or water or any combination of such substances for the public.

15 Pa. C.S. § 1511(a)(2).

[3] 66 Pa. C.S. §§ 101-3316.

2

issued by PUC pursuant to Section 1101 of the Code, 66 Pa. C.S. § 1101, before exercising the power of eminent domain.[4]

Both FERC and PUC regulate the shipments of natural gas and petroleum products or service through those pipelines, and not the actual physical pipelines

---

[4] Section 1101 of the Code (related to the organization of public utilities and the beginning of service) provides:

> Upon the application of any proposed public utility and the approval of such application by the commission evidenced by its certificate of public convenience first had and obtained, it shall be lawful for any such proposed public utility to begin to offer, render, furnish, or supply service within this Commonwealth. The commission's certificate of public convenience granted under the authority of this section shall include a description of the nature of the service and of the territory in which it may be offered, rendered, furnished or supplied.

66 Pa. C.S. § 1101. Similarly, Section 1102 of the Code (related to the enumeration of the acts requiring a certificate of public convenience), provides, in part, as follows:

> **(a)** *General rule*.--Upon the application of any public utility and the approval of such application by the commission, evidenced by its certificate of public convenience first had and obtained, and upon compliance with existing laws, it shall be lawful:
>
> (1) For any public utility to begin to offer, render, furnish or supply within this Commonwealth service of a different nature or to a different territory . . . .

66 Pa. C.S. § 1102. Section 1104 of the Code states:

> **§ 1104. Certain appropriations by right of eminent domain prohibited.**
>
> Unless its power of eminent domain existed under prior law, no domestic public utility or foreign public utility authorized to do business in this Commonwealth shall exercise any power of eminent domain within this Commonwealth until it shall have received the certificate of public convenience required by section 1101 (relating to organization of public utilities and beginning of service).

66 Pa. C.S. § 1104.

conveying those liquids. (R.R. at 1344a.) FERC's jurisdiction is derived from the Interstate Commerce Act (ICA) and applies to **interstate** movements,[5] while the Code and PUC's jurisdiction apply to **intrastate** movements.[6] This jurisdiction is not mutually exclusive. See, e.g., Amoco Pipeline, Co., 62 F.E.R.C. ¶ 61119, at 61803-61804, 1993 WL 25751, at *4 (Feb. 8, 1993) (finding that "the commingling of oil streams is not a factor in fixing jurisdiction under the ICA"); (R.R. at 687a, 693a, 1379a-80a.) In Amoco, FERC held as follows:

> Amoco argues that the commingling of the crude oil from Wyoming and other states makes all of the commingled crude oil subject to the interstate rate. This argument has no merit. As the cases demonstrate, the commingling of oil streams is not a factor in fixing jurisdiction

---

[5] See, e.g., 42 U.S.C. § 7155; 42 U.S.C. § 7172(b) (transferring authority conferred by ICA upon the Interstate Commerce Commission (ICC) to regulate pipeline transportation of oil to FERC); 49 U.S.C. § 60502 (regarding FERC jurisdiction over rates for the transportation of oil by pipeline formerly vested in the ICC). According to its website, FERC is an independent agency that among other duties regulates the interstate transmission of electricity, natural gas and oil. The website further notes that many areas beyond FERC's jurisdiction are within the province of state public utility commissions. Federal Energy Regulatory Commission, What FERC Does, available at http://ferc.gov/about/ferc-does.asp (last visited May 20, 2016).

[6] Pipeline transportation services are defined as public utility services under Section 102 of the Code, 66 Pa. C.S. § 102, which provides as follows:

**§ 102. Definitions.**
                         * * *
*Public utility.*

   **(1)** Any person or corporations now or hereafter owning or operating in this Commonwealth equipment or facilities for:
                         * * *
**(v)** Transporting or conveying natural or artificial gas, crude oil, gasoline, or petroleum products, materials for refrigeration, or oxygen or nitrogen, or other fluid substance, by pipeline or conduit, for the public for compensation.

Id.

4

under the ICA. Rather, we look to the "fixed and persistent intent of the shipper," and to such factors as whether storage or processing interrupt the continuity of the transportation.

It is not disputed that both interstate and intrastate transportation occur over the pipeline segments in question, nor is there any dispute that crude oil shipped by Sinclair over these segments, no matter where produced, is destined for Sinclair's Wyoming refineries. Therefore, the crude oil produced outside of Wyoming and transported over Amoco's Wyoming facilities to Sinclair's refineries in that state is moving in interstate commerce and is covered by the tariffs filed by Amoco with this Commission. Transportation over Amoco's facilities of that portion of the crude oil that is both produced and refined in Wyoming is subject to the regulation of the Wyoming [Public Service Commission]. Commingling does not alter the jurisdictional nature of the shipments, and as Sinclair has stated, the question of jurisdiction arises only in the context of the facts relevant to individual shipments.

Amoco argues that later decisions have effectively overruled this precedent. However, the cases cited by Amoco relate to the transportation of natural gas, which is governed by the Natural Gas Act (NGA), and which do not control our determination of the effect of commingling crude oil from various sources.

62 F.E.R.C. at ¶¶ 61803-61804, 1993 WL 25751 at *4. See also National Steel Corp. v. Long, 718 F. Supp. 622, 625 (W.D. Mich. 1989) (holding in a prospective challenge to the exercise of regulatory jurisdiction by the Michigan Public Service Commission that the federal scheme under the ICA "is not so comprehensive as to address the local interests which are the focus of state regulation."); Humble Oil & Refining Co. v. Tex. & Pac. Ry. Co., 289 S.W.2d 547 (Tex. 1955) (where shipper produced oil in New Mexico and Texas and delivered it by pipeline to Texas tank farm where it was commingled and shipped by rail to various destinations, the shipper accepting at destination the equivalent of oil delivered to farm, that portion of oil shipped which was equivalent in volume to that produced in New Mexico was subject to interstate rate, while that portion equivalent in volume to that

5

produced in Texas was subject to intrastate rate.); <u>Removing Obstacles to Increased Elec. Generation & Natural Gas Supply in the W. United States</u>, 94 F.E.R.C. ¶¶ 61272, 61977 (Mar. 14, 2001) (FERC authority limited to regulating terms and rates of interstate shipments on a proposed line).  Thus, it is apparent from these authorities that it is PUC, and not FERC, that has authority to regulate intrastate shipments.  Similarly, the record shows that pipeline service operators in Pennsylvania, such as Sunoco, can be, and frequently are, simultaneously regulated by both FERC and PUC through a regulatory rubric where FERC jurisdiction is limited only to interstate shipments, and PUC's jurisdiction extends only to intrastate shipments.  (R.R. at 1379a-80a.)

## B.     Regulation of Sunoco as a Public Utility

As to Sunoco generally, the record shows that it has been operating as a public utility corporation[7] in Pennsylvania since 2002, at which time Sunoco

---

[7] Sunoco points out that the term "public utility corporation" is not limited to corporations, but also includes partnerships and limited liability companies, citing Section 8102(a)(2) of the BCL, 15 Pa. C.S. § 8102(a)(2), which provides that:

**§ 8102. Interchangeability of partnership, limited liability company and corporate forms of organization.**

**(a)** *General rule.* **--**

Subject to any restrictions on a specific line of business made applicable by section 103 (relating to subordination of title to regulatory laws):

\* \* \*

**(2)** A domestic or foreign partnership or limited liability company may exercise any right, power, franchise or privilege that a domestic or foreign corporation engaged in the same line of business might exercise under the laws of this Commonwealth, including powers conferred by section 1511 (relating to additional powers of certain public utility corporations) or other provisions of law

*(Continued…)*

6

received PUC approval for the transfer, merger, possession, and use of all assets of the Sun Pipe Line Company ("Sun") and of the Atlantic Pipeline Corporation ("Atlantic"), both of which were subject to PUC jurisdiction. (R.R. at 28a-33a, 670a.) As such, Sunoco came into possession of a pipeline system operated previously by Sun and its predecessors and Atlantic and its predecessors. This "legacy" pipeline system operated under CPCs issued in 1930 and 1931 by PUC's statutory predecessor, the Pennsylvania Public Service Commission. (R.R. at 89a-90a.) The record substantiates that the pipeline system previously provided and currently provides interstate and intrastate service on the same pipelines. (R.R. at 90a-93a, 657a, 672a, 687a, 821a-22a, 1383a-87a.) PUC has regulated Sunoco's intrastate pipeline transportation of petroleum products and refined petroleum products since 2002, and FERC has regulated Sunoco's interstate service of the same products on the same pipelines. (R.R. at 90a-93a, 1383a-87a.)

As to regulation by PUC, that agency in an Order entered on October 29, 2014 concluded that: "Sunoco has been certificated as a public utility in Pennsylvania for many years, and [that] the existence of Commission Orders granting the [CPCs] to Sunoco is prima facie evidence . . . that Sunoco is a public utility under the Code." (R.R. at 116a.) PUC further explained that Sunoco's existing authority under its prior CPCs gave it the right to reverse the flow within the existing pipeline and to add new pipelines if Sunoco concluded it was necessary to expand the previously certificated service, stating:

---

granting the right to a duly authorized corporation to take or occupy property and make compensation therefor.

Id.

7

Thus, Sunoco has the **authority to provide intrastate petroleum and refined petroleum products bi-directionally through pipeline service** to the public between the Ohio and New York borders and Marcus Hook, Delaware County through generally identified points. This authority is not contingent upon a specific directional flow or a specific route within the certificated territory. Additionally, this authority is not limited to a specific pipe or set of pipes, but rather, **includes both the upgrading of current facilities and the expansion of existing capacity as needed for the provision of the authorized service within the certificated territory**.

(R.R. at 122a (emphasis added).)

Additionally, by Order dated July 24, 2014, PUC clarified Sunoco's authority under its existing CPCs to transport petroleum products and refined petroleum products, including propane,[8] between Delmont, Westmoreland County

---

[8] PUC has interpreted the definition of "petroleum products" broadly to encompass what would otherwise be an exhaustive list of products. This list includes propane. See <u>Petition of Sunoco Pipeline, L.P. for Amendment of the Order Entered on August 29, 2013</u>, Entered July 24, 2014, Docket No. P-2014-2422583, at 9 n.5, (R.R. at 41a-51a); and <u>Petition of Granger Energy of Honey Brook LLC</u>, Docket No. P-00032043, at 14 (Order entered August 19, 2004). In these Orders, PUC held that this interpretation is consistent with the definition of "petroleum gas" in the federal gas pipeline transportation safety regulations at 49 C.F.R. Part 192. Part 192 has been adopted by PUC and defines "petroleum gas" to include propane. 49 C.F.R. § 192.3. PUC posits that its interpretation also is consistent with the definition of "petroleum" in the federal hazardous liquids pipeline safety regulations at 49 C.F.R. Part 195. Part 195 also has been adopted by PUC (52 Pa. Code § 59.33(b)) and defines "petroleum" to include natural gas liquids and liquefied petroleum gas, which can include propane. 49 C.F.R. § 195.2. The following definitions can be found in the Parts 192 and 195 of the CFR:

§ 192.3 Definitions.

As used in this part:

* * *

Petroleum gas means propane, propylene, butane, (normal butane or isobutanes), and butylene (including isomers), or mixtures composed predominantly of these gases, having a vapor pressure not exceeding 208 psi (1434 kPa) gage at 100° F (38° C).

*(Continued…)*

8

and Twin Oaks, Delaware County. (R.R. at 41a-51a.) Therein, PUC stated that **Sunoco retained that authority under its 2002 CPCs**, its prior suspension and abandonment of gasoline and distillate service notwithstanding. (R.R. at 49a.) PUC further found that Sunoco's proposed intrastate propane service would result in "numerous potential public benefits" by allowing Sunoco "to immediately address the need for uninterrupted deliveries of propane in Pennsylvania and to ensure that there is adequate pipeline capacity to meet peak demand for propane during the winter heating season." (R.R. at 49a-50a.)

Further, by Order dated August 21, 2014, PUC **granted Sunoco's Application for a CPC** to expand its service territory into Washington County. (R.R. at 60a-64a.) In that Application, Sunoco stated that it intended to expand the capacity of the Mariner East Project by implementing the Mariner East 2 pipeline, which would increase the take-away capacity of natural gas liquids (NGLs)[9] from

---

49 C.F.R. § 192.3

> § 195.2 Definitions
>
> As used in this part—
>
> * * *
>
> Petroleum means crude oil, condensate, natural gasoline, natural gas liquids, and liquefied petroleum gas.
>
> Petroleum product means flammable, toxic, or corrosive products obtained from distilling and processing of crude oil, unfinished oils, natural gas liquids, blend stocks and other miscellaneous hydrocarbon compounds.

49 C.F.R. § 195.2

[9] According to the United States Energy Information Administration:

> Natural gas liquids (NGLs) are hydrocarbons—in the same family of molecules as natural gas and crude oil, composed exclusively of carbon and hydrogen. Ethane, propane, butane, isobutane, and pentane are all NGLs . . . NGLs are used as inputs

*(Continued…)*

9

the Marcellus Shale and allow Sunoco to provide additional on-loading and off-loading points within Pennsylvania for interstate and intrastate propane shipments. (R.R. at 61a-62a.) PUC, by authorizing the provision of intrastate petroleum and refined petroleum products pipeline transportation service in Washington County in the August 21, 2014 Order expanded the service territory in which Sunoco is authorized to provide Mariner East service. (R.R. at 60a-64a.) PUC found that the expansion was in the public interest, stating:

> Upon full consideration of all matters of record, we believe that approval of this Application is **necessary and proper for the service, accommodation, and convenience of the public**. We believe granting Sunoco authority to commence intrastate transportation of propane in Washington County will enhance delivery options for the transport of natural gas and natural gas liquids in Pennsylvania. In the wake of the propane shortage experienced in 2014, Sunoco's proposed service **will increase the supply of propane in markets with a demand for these resources, including in Pennsylvania**, ensuring that **Pennsylvania's citizens enjoy access to propane heating fuel**. Additionally, the proposed service will offer a **safer and more economic transportation alternative** for shippers to existing rail and trucking services . . . .

---

for petrochemical plants, burned for space heat and cooking, and blended into vehicle fuel . . . .

The chemical composition of these hydrocarbons is similar, yet their applications vary widely. Ethane occupies the largest share of NGL field production. It is used almost exclusively to produce ethylene, which is then turned into plastics. Much of the propane, by contrast, is burned for heating, although a substantial amount is used as petrochemical feedstock . . . .

United States Energy Information Administration, Today in Energy, April 20, 2012, available at http://www.eia.gov/todayinenergy/detail.cfm?id=5930&src=email (last visited May 20, 2016).

10

(R.R. at 63a (emphasis added).)[10]

Therefore, pursuant to PUC's Orders, Sunoco has CPCs that authorize it to transport, via its pipeline system, petroleum and refined petroleum products, including propane, from and to points within Pennsylvania. This authority was expanded to include Washington County in recognition of the public need and the importance of increasing the supply of propane to the citizens of Pennsylvania.

## C. The Mariner East Project

In 2012, Sunoco announced its intent to develop an integrated pipeline system for transporting petroleum products and NGLs such as propane, ethane, and butane from the Marcellus and Utica Shales in Pennsylvania, West Virginia and Ohio to the Marcus Hook Industrial Complex ("MHIC") and points in between. (R.R. at 9a, 46a, 1377a.) Sunoco's various filings describe the overall goal of the Mariner East Project as an integrated pipeline system to move NGLs from the Marcellus and Utica Shales through and within the Commonwealth; and to provide

---

[10] Sunoco also points out that it has filed all necessary tariffs required to implement the intrastate service proposed by the Mariner East Project. The authority to file a tariff is limited to a public utility regulated by PUC. Section 1302 of the Code states that "every public utility shall file with the [C]ommission . . . tariffs showing all rates established by it and collected or enforced, or to be collected or enforced, within the jurisdiction of the [C]ommission." 66 Pa. C.S. § 1302. The record contains the following with regard to Sunoco's tariffs:

Sunoco filed Tariff Pipeline – Pa. P.U.C. No. 16 on June 12, 2014. By final Order dated August 21, 2014, in Docket No. R-2014-2426158 PUC permitted the tariff to become effective on October 1, 2014. (R.R. at 53a-56a.) On November 6, 2014, Sunoco filed Supplement No. 2 Tariff Pipeline-Pa P.U.C. No. 16 (Supplement No. 2) to become effective January 5, 2015. (R.R. at 66a.) Supplement No. 2 proposed to add the new origin point of Houston, Washington County for west-to-east intrastate movements of propane, based on the CPCs issued. (Id.) On December 18, 2014, Sunoco filed Supplement No. 4 voluntarily postponing the effective date to January 16, 2015. PUC allowed Tariff Pipeline-Pa. P.U.C. No. 16 and Supplement No. 2 to become effective. (R.R. at 53a-57a, 66a-69a.)

11

take away capacity for the Marcellus and Utica Shale plays and the flexibility to reach various commercial markets, using pipeline and terminal infrastructure **within the Commonwealth**.  (R.R. at 61a, 91a, 93a-94a, 656a, 662a.)

### 1.  Mariner East 1

The Mariner East Project has **two phases**.  The first, referred to as **Mariner East 1, has been completed** and utilized Sunoco's existing pipeline infrastructure, bolstered by a 51-mile extension from Houston, in Washington County, to Delmont, in Westmoreland County, to ship 70,000 barrels per day of NGLs from the Marcellus Shale basin to the MHIC.  (R.R. at 46a, 93a, 498a, 1377a.)

### 2.  Mariner East 2

Sunoco has begun work on the **second phase** of the Mariner East Project, known as **Mariner East 2.**  (R.R. at 16a.)  Unlike Mariner East 1, which used both existing and new pipelines, **Mariner East 2 requires construction of a new 351-mile pipeline largely tracing the Mariner East 1 pipeline route, with origin points in West Virginia, Ohio, and Pennsylvania**.  (R.R. at 658a, 1377a-78a.) Sunoco's plans for the Mariner East 2 phase include **constructing two adjacent pipelines** separated by approximately five feet over the portion of the Mariner East line which runs from Delmont, Pennsylvania to the MHIC, and a single line over the portion of the Mariner East line which runs between Delmont and the West Virginia border.  (R.R. at 17a.)  With the exception of some valves, **Mariner East 2** will be below ground level, with most of it **paralleling and within the existing right of way of the Mariner East 1 pipeline**.  **Part of Mariner East 2 will be**

12

**located in Cumberland County which is within the geographic scope of the CPC issued to Sunoco by the PUC.** (R.R. at 12a, 18a.)

While Mariner East 1 was underway, Marcellus and Utica Shale producers and shippers advised Sunoco that there was a need for additional capacity to transport more than the 70,000 barrels of NGLs per day being transported by Mariner East 1. (R.R. at 694a-95a, 1339a, 1378a.) Sunoco thus undertook to expand Mariner East Project capacity and developed the Mariner East 2 pipeline. (R.R. at 1339a-40a, 1384a.)

This expansion of the Mariner East 1 service will enlarge capacity to allow movement of an additional 275,000 barrels per day of NGLs, (R.R. at 498a), thereby allowing shippers from the Marcellus and Utica Shales to transport more barrels of NGLs through the Commonwealth to destinations within the Commonwealth, as well as to the MHIC for storage, processing, and distribution to local, domestic, and international markets. (R.R. at 604a, 1251a.) It is intended to increase the take-away capacity of NGLs from the Marcellus and Utica Shales and enable Sunoco to provide additional on-loading and off-loading points within Pennsylvania for both interstate and intrastate propane shipments and increase the amount of propane that would be available for delivery or use in Pennsylvania. (R.R. at 661a-64a, 1377a-78a.)

PUC recognized this second phase of the Mariner East Project in its August 21, 2014 Order granting Sunoco's CPC application for Washington County, stating:

> Subject to continued shipper interest, Sunoco intends to undertake a second phase of the Mariner East project, which will expand the capacity of the project by constructing: (1) a 16 inch or larger pipeline, paralleling its existing pipeline from Houston, PA to

13

the Marcus Hook Industrial Complex and along much of the same route, and (2) a new 15 miles of pipeline from Houston, PA to a point near the Pennsylvania-Ohio boundary line. **This second phase, sometimes referred to as "Mariner East 2", will increase the take-away capacity of natural gas liquids from the Marcellus Shale and will enable Sunoco to provide additional on-loading and off-loading points within Pennsylvania** for both **intrastate** and interstate propane shipments.

(R.R. at 61a-62a (emphasis added).)

Sunoco does not contest that the Mariner East Project initially was prioritized for interstate service.[11]  However, before PUC and common pleas, Sunoco explained that during and after winter 2013-2014, as a result of the "polar vortex," it had a significant increase in shipper demand for intrastate shipments of propane due to an increase in consumer demand within Pennsylvania as a result of shortages due to harsh winter conditions and insufficient pipeline infrastructure. (R.R. at 694a-95a, 1378a.)  These changes in market conditions led Sunoco to accelerate its provision of intrastate service on the Mariner East Project.  Sunoco thus sought and obtained PUC approval to provide intrastate service on the Mariner East 1 and 2 pipelines as described above.  As described in more detail below, PUC issued three final Orders in 2014 and two final Orders in 2015 confirming that Sunoco is a public utility corporation subject to PUC regulation as a public utility.  PUC also recognized that the service provided by both phases of the Mariner East Project is a public utility service.

---

[11] The York County decision upon which Condemnees rely for their collateral estoppel argument and which we address <u>infra</u> was issued during this timeframe and prior to Sunoco's decision to expand service on the Mariner East Project to include intrastate service.

### 3. PUC Orders and Tariffs

Sunoco on May 21, 2014 filed an application pursuant to Section 703(g) of the Code, 66 Pa. C.S. § 703(g),[12] to clarify an August 29, 2013 PUC Order granting Sunoco authority to suspend and abandon its provision of east-to-west gasoline and distillate service (and the corresponding tariffs) in certain territories along its pipeline in order to facilitate the west-to-east Mariner East service of NGLs in those territories. (R.R. at 10a.) PUC on July 24, 2014, issued an Opinion and Order granting Sunoco's Application and reaffirmed Sunoco's authority under its existing CPCs to transport petroleum products and refined petroleum products, including propane, between Delmont, Westmoreland County, and Twin Oaks, Delaware County. (Id.) This approved route includes Cumberland County. (R.R. at 12a, 18a.)

PUC in its July 24, 2014 Order recognized that: circumstances changed regarding the Mariner East Project since August 2013 and that in response, Sunoco intended to provide intrastate transportation service of propane to respond to changing market conditions and increased shipper interest in additional intrastate

---

[12] Section 703(g) of the Code provides:

§ 703. Fixing of hearings.

\* \* \*

(g) *Rescission and amendment of orders.--*

The commission may, at any time, after notice and after opportunity to be heard as provided in this chapter, rescind or amend any order made by it. Any order rescinding or amending a prior order shall, when served upon the person, corporation, or municipal corporation affected, and after notice thereof is given to the other parties to the proceedings, have the same effect as is herein provided for original orders.

66 Pa. C.S. § 703(g).

pipeline service facilities; the definition of "petroleum products" is interpreted broadly to encompass propane; and Sunoco's proposed intrastate propane service will result in numerous public benefits by allowing it "to immediately address the need for uninterrupted deliveries of propane in Pennsylvania and to ensure that there is adequate pipeline capacity to meet peak demand for propane during the winter heating season." (R.R. at 48a-50a.)

In addition to the May 21, 2014 application, Sunoco on June 12, 2014 filed Tariff Pipeline Pa. P.U.C. No. 16, with a proposed effective date of October 1, 2014. This tariff reflected PUC-regulated pipeline transportation rate for the west-to-east intrastate movement of propane from Mechanicsburg (Cumberland County) to Twin Oaks. (R.R. at 53a-54a.) PUC by final Order dated August 21, 2014, permitted the tariff to become effective on October 1, 2014. (R.R. at 53a-57a.)

PUC, by these actions and through Sunoco's previously obtained CPCs, authorized Sunoco as a public utility to transport, as a public utility service, petroleum and refined petroleum products both east to west and west to east in the following Pennsylvania counties through which the Mariner East Project is located: Allegheny, Westmoreland, Indiana, Cambria, Blair, Huntingdon, Juniata, Perry, **Cumberland**, York, Dauphin, Lebanon, Lancaster, Berks, Chester, and Delaware. (R.R. at 10a-12a, 48a-49a, 60a-64a.)

Sunoco's service territory originally did not include Washington County because Sunoco did not maintain facilities there and had not applied to PUC for a CPC for that county. However because the planned Mariner East service would originate in Washington County, Sunoco on June 6, 2014 applied to PUC to expand its service territory into that county. (R.R. at 12a-13a.) PUC by Order dated August 21, 2014 granted Sunoco's application and authorized the provision

16

of intrastate petroleum and refined petroleum products pipeline transportation service in Washington County, thus expanding Sunoco's service territory for its intrastate Mariner East service. (R.R. at 60a-64a.)

## II. Background of the Instant Appeals

The genesis of this matter was the filing by Sunoco on July 21, 2015 of the three Declarations in common pleas. As to Condemnees R. Scott Martin and Pamela S. Martin, Sunoco sought to condemn a permanent non-exclusive easement of 1.5 acres, a temporary workspace easement of 0.72 acres, and an additional workspace easement of 0.12 acres on the Martins' property on Longs Gap Road, North Middleton Township, Cumberland County. (R.R. at 7a-156a.) As to Condemnees Douglas M. Fitzgerald and Lyndsey M. Fitzgerald, Sunoco sought to condemn a permanent non-exclusive easement of 0.14 acres and a temporary workspace easement of 0.07 acres on the Fitzgeralds' property at 281 Pine Creek Drive, Carlisle, Cumberland County. (R.R. at 307a-454a.) As to Condemnees Harvey A. Nickey and Anna M. Nickey, Sunoco sought to condemn a permanent non-exclusive easement of 0.7 acres, and a temporary workspace easement of 0.31 acres on the Nickeys' property at 125 Blain McCrea Road, Lower Mifflin Township, Cumberland County. (R.R. at 157a-306a.) Condemnees filed Preliminary Objections to the Declarations for their respective properties. (R.R. at 455a-507a, 561a-613a, 508a-560a.)

Condemnees are here, and were before common pleas, represented by the same counsel. Hence all three sets of Preliminary Objections raised the same objections to the Declarations subject to variances for the individual properties. All Condemnees objected: that Sunoco lacked the power or the right to condemn

17

their land as Sunoco was not a public utility regulated by PUC for the Mariner East 2 pipeline; that Sunoco's corporate resolution authorized takings only for an **interstate** pipeline and not an **intrastate** pipeline; that the declarations were barred by collateral estoppel on the basis of the York County decision; that the Mariner East 2 pipeline was an interstate pipeline and not an intrastate pipeline; that the Declarations sought to condemn their properties for two pipelines while the agency Condemnees assert has sole jurisdiction, FERC, approved only one pipeline; that Sunoco lacked the FERC Certificate of Public Convenience and Necessity (Certificate) necessary to exercise eminent domain power for the pipeline; and that Sunoco's proposed bond amounts were insufficient. (Id.)

Sunoco filed responses to Condemnees' Preliminary Objections that were, like the objections, essentially uniform. With regard to the corresponding objections referenced in the preceding paragraph, Sunoco asserted: that PUC recognizes that, the fact that Sunoco has FERC authorization to make interstate movements on Mariner East notwithstanding, Sunoco also has authority under state law to provide intrastate service as a public utility regulated by PUC; that the corporate resolution attached to the Declarations is not defective in any way; that the identical issue of whether Sunoco has the power of eminent domain to condemn for the Mariner East 2 pipeline was not decided previously in the York County decision; that the Mariner East 2 pipeline is regulated by both PUC and by FERC; that FERC's regulation of interstate shipments on Mariner East 2 pipeline is inapplicable to a determination of Sunoco's eminent domain authority as a Pennsylvania-regulated public utility; that a FERC Certificate is not the only method by which a public utility can obtain eminent domain power in Pennsylvania where state law provides eminent domain authority both to utilities

18

regulated by PUC and to utilities regulated by an officer or agency of the United States, such as FERC; and that the bonds posted by Sunoco were adequate. (R.R. at 621a-33a, 951a-63a, 786a-98a.)

## III.    Common Pleas Decision

Common pleas consolidated the three Declarations and Preliminary Objections for hearing as they essentially were identical,[13] and scheduled a hearing on the Preliminary Objections for September 22, 2015.  Both Condemnees and Sunoco offered testimony and entered exhibits into the record.  (R.R. at 1328a-1998a.)  Common pleas on September 29, 2015, entered its Order overruling Condemnees' Preliminary Objections.[14]  Condemnees appealed to this Court and

---

[13] (December 22, 2015 Op. at 2 n.1.)

[14] Common pleas added the following footnote to its September 29, 2015 Order:

We feel that a brief explanation of our decision is appropriate in regards to [sic] Preliminary Objections 1, 3 and 7. As to the first Preliminary Objection, the Mariner East 2 (ME2) pipeline at issue will provide both loading and offloading of ethane, propane, liquid petroleum gas and other petroleum products within the Commonwealth. As such, ME2 provides intrastate service, regulated by the Pennsylvania Public Utility Commission (PUC). [Sunoco] is a "[p]ublic utility corporation" as defined at 15 Pa. C.S.[] § 1103. Pennsylvania public utility corporations possess the power of eminent domain. 15 Pa. C.S.[] § 1511. Since ME2 may be regulated by both the Federal Energy Regulatory Commission (FERC) and the PUC, federal preemption is not at issue.

As to the third Preliminary Objection, the Honorable Judge Linebaugh's decision in Sunoco Pipeline, L.P. v. Loper, 2013-SU-4518-05 (C.P. York, February 24, 2014) (reaffirmed March 25, 2014) is inapposite to the case at bar. Loper was decided when Condemnor's plans for ME2 consisted of the installation of a purely interstate pipeline, crossing Pennsylvania state lines but containing no stations for the off-loading of transported materials. In Loper, Condemnor had argued that FERC provided that with the power of eminent domain for a purely *interstate* pipeline. Since that decision Condemnor has reconfigured ME2 to be

*(Continued…)*

19

common pleas directed the filing of a Concise Statement of Errors Complained of on Appeal (Statement) pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 1925(b).[15] Following receipt of Condemnees' Statements, common pleas on December 22, 2015 issued its Opinion in support of its September 29, 2015 Order. Common pleas first addressed Condemnees' contention that FERC possesses sole jurisdiction over the Mariner East 2 pipeline. After repeating the text of the first paragraph of the footnote from the September 29, 2015 Order, common pleas noted that "the Natural Gas Act (NGA)[] 15 U.S.C. § 717(a)(5)[] . . . grants 'FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale,'" but observed further that "[h]owever, [Mariner East 2 pipeline] will transport natural gas liquids (NGLs), and thus, the physical pipeline is not regulated under the ambit of FERC through

---

both an *interstate* pipeline as well as an *intrastate* pipeline subject to PUC regulation.

While we had questions as to the adequacy of the bond, the Condemnees failed to present any evidence as to the effect of the taking upon the value of their property. Therefore we have no alternative but to overrule their seventh Preliminary Objection.

(September 29, 2015 Order at 2 (emphasis in original).)

[15] Pa. R.A.P. 1925(b) provides as follows:

**Rule 1925. Opinion in Support of Order**

* * *

**(b) Direction to file statement of errors complained of on appeal; instructions to the appellant and the trial court.--**If the judge entering the order giving rise to the notice of appeal ("judge") desires clarification of the errors complained of on appeal, the judge may enter an order directing the appellant to file of record in the trial court and serve on the judge a concise statement of the errors complained of on appeal ("Statement").

Id.

the NGA[].” (December 22, 2015 Op. at 3 (footnote omitted) (citation omitted).) Common pleas stated further that:

> Condemnees[] also argue that because [Sunoco] did not receive a Certificate . . . . from FERC for ME2, they do not possess the power of eminent domain under federal law. Again, Condemnees are operating under the mistaken belief that FERC regulates the siting of NGL pipelines.[] FERC, pursuant to the NGA, regulates the siting of pipelines that carry interstate shipments of natural gas, doing so through the issuance of a CPC.[] Because FERC does not possess authority to regulate the siting of NGL pipelines, the responsibility falls to state agencies regardless of the physical jurisdiction of the NGL pipeline.[]
>
> We were satisfied that the PUC regulates intrastate shipments of NGL. Therefore, [Sunoco] is considered a "public utility corporation" under Pennsylvania's Business Corporation Laws (BCL).[] Pursuant to 15 Pa.C.S.[] § 1511(a)(2), public utility corporations "have the right to take, occupy and condemn property for [the] principal purpose[] and ancillary purposes reasonably necessary or appropriate for the accomplishment of . . . [t]he transportation of . . . petroleum or petroleum products . . . for the public." As a result, [Sunoco] has the power of eminent domain to condemn property for the construction of [Mariner East 2 pipeline].

(December 22, 2015 Op. at 3-4 (footnotes omitted).)

Common pleas next addressed Condemnees' collateral estoppel argument and relied on the text of the second paragraph of the footnote from the September 29, 2015 Order quoted above in holding that the reasoning in the York County decision relied upon by Condemnees, Sunoco Pipeline, L.P. v. Loper, 2013-SU-4518-05 (C.P. York, February 24, 2014) (reaffirmed March 25, 2014), did not apply in this instance because Sunoco reconfigured the Mariner East 2 pipeline "to be both an interstate pipeline as well as an intrastate pipeline subject to PUC regulation." (December 22, 2015 Op. at 4-5.) With regard to Condemnees' argument that Sunoco, to obtain the power of eminent domain under the BCL,

21

must be granted a FERC Certificate as set forth in Nat'l Fuel Gas Supply Corp. v. Kovalchick Corp., 74 Pa. D. & C. 4th 22 (2005), common pleas concluded that Kovalchick also was inapposite to the facts of this case. Common pleas noted that the condemnor in Kovalchick was granted eminent domain power because it was subject to FERC regulation under the NGA. However, as common pleas earlier concluded that the Mariner East 2 pipeline was not regulated by FERC under the NGA because it does not transport natural gas; common pleas held that Sunoco did not need a FERC Certificate to obtain the eminent domain power under the BCL. (December 22, 2015 Op. at 5-6.) Common pleas also rejected Condemnees' argument that PUC's orders issued to Sunoco regarding the Mariner East project did not include a reference to the Mariner East 2 pipeline, noting that PUC Order attached to each Declaration as Exhibit D provides:

> Subject to continued shipper Interest, Sunoco intends to undertake a second phase of the Mariner East project . . . This second phase, sometimes referred to as 'Mariner East 2', [sic] will increase the take-away capacity of natural gas from the Marcellus Shale and will enable Sunoco to provide additional on-loading and offloading points within Pennsylvania for both intrastate and interstate propane shipments.

(December 22, 2015 Op. at 6.)[16]

---

[16] Common pleas also rejected Condemnees' arguments that Sunoco's corporate resolutions authorized takings for interstate pipelines only. (December 22, 2015 Op. at 5-6.) Condemnees do not pursue that argument here.

## IV. Issues Before This Court

### A. Collateral Estoppel

Condemnees appealed to this Court.[17] Condemnees first argue that common pleas erred when it declined to find that Sunoco's Petitions were barred by the doctrine of collateral estoppel based on Loper. As described above, common pleas concluded that Loper is inapposite to this matter because it was decided when Sunoco's plans for the Mariner East 2 pipeline featured a purely **interstate** pipeline, crossing Pennsylvania state lines but containing no stations for the off-loading of transported materials in Pennsylvania. Common pleas pointed out here that in Loper, Sunoco argued that **FERC** provided it with the power of eminent domain for a purely interstate pipeline, and that subsequently Sunoco repurposed Mariner East 2 to be **both an interstate pipeline** as well as an **intrastate pipeline** subject to PUC regulation.

Condemnees argue here that common pleas erred and that Mariner East 2 is in **interstate service only**. On that basis, PUC lacks jurisdiction and Sunoco thus is not a public utility corporation under the BCL. Moreover, Condemnees assert that Sunoco is regulated by FERC as a common carrier and not as a public utility with the power of eminent domain. Condemnees state that in Loper, Sunoco contended that it is a public utility under the BCL and therefore clothed with the eminent domain power and that Sunoco makes the same argument in this matter. For these reasons, Condemnees argue that the issue presented before common

---

[17] In an eminent domain case disposed of on preliminary objections this Court is limited to determining if common pleas' necessary findings of fact are supported by competent evidence and if an error of law or an abuse of discretion was committed. Stark v. Equitable Gas Co., LLC, 116 A.3d 760, 765 n.8 (Pa. Cmwlth. 2015).

pleas is identical to that presented in Loper and that collateral estoppel applies to bar Sunoco's Declarations as to Condemnees.

Collateral estoppel bars any subsequent action where the sole issue requiring judgment was litigated previously. Thompson v. Karastan Rug Mills, 323 A.2d 341, 343 (Pa. Super. 1974). For collateral estoppel to apply, the following conditions must be met: (1) the issue or issue of fact previously determined in a prior action are the same (no requirement that the cause of action be the same); (2) the previous judgment is final on the merits; (3) the party against whom the doctrine is invoked is identical to the party in the prior action; and (4) the party against whom estoppel is invoked had full and fair opportunity to litigate the issue in the prior action. Dep't of Transp. v. Martinelli, 563 A.2d 973, 976 (Pa. Cmwlth. 1989).

Based on the record in this case, common pleas did not err in finding that collateral estoppel does not bar this action. The issue decided in Loper is not the same issue raised in this case, and so it does not meet the first condition. At issue in Loper was whether Sunoco satisfied the definition of public utility corporation as a result of the regulation of its interstate service by FERC and not as a result of PUC's regulation of its intrastate service. At the time Loper was decided, Sunoco had not yet sought or obtained PUC approval to provide intrastate service. (R.R. at 107a, 1378a.) The Loper court addressed only whether Sunoco was a public utility corporation because it was subject to regulation as a public utility by an officer or agency of the United States, i.e., FERC, and did not decide whether Sunoco was a public utility corporation because it was subject to regulation as a public utility by PUC, the issue raised here. Although Condemnees disagree that Sunoco can prevail on this issue that is a separate inquiry from whether the issue was

24

previously decided.  For these reasons, we agree that collateral estoppel is not a bar to this case.

**B.    Whether Mariner East is both an Interstate and Intrastate Pipeline**

Condemnees next argue that common pleas erred when it concluded that the Mariner East 2 pipeline was both an **interstate** and an **intrastate** pipeline subject to PUC jurisdiction.  This argument is grounded in the fact that Sunoco is a common carrier under the ICA and that it obtained FERC approval to transport NGLs from Ohio and West Virginia to the MHIC and beyond via the Mariner East 2 pipeline.  Put another way, Condemnees assert that PUC has jurisdiction only over pipelines beginning and ending **entirely in Pennsylvania**, and that the Mariner East 2 pipeline is solely in interstate commerce because it crosses state lines.  Condemnees maintain that Sunoco thus lacks eminent domain power because the Mariner East 2 pipeline can never be regulated by PUC as the Code prohibits PUC from regulating interstate commerce.  Condemnees argue that common pleas used an incorrect conception of interstate commerce and cite numerous decisions for the proposition that a pipeline that crosses a state line is in interstate commerce and that products in that pipeline remain in interstate commerce during their entire journey.  Condemnees thus disagree with common pleas' conclusion that, because the Mariner East 2 pipeline "will provide both loading and offloading of ethane, propane, liquid petroleum gas and other petroleum products within the Commonwealth . . . [it] provides intrastate service, regulated by the [PUC]."  (September 29, 2015 Order at 2 n.1.)

Based on our review, we conclude that the record establishes that the expanded service to be provided by the Mariner East 2 pipeline will involve **both**

25

**interstate service** (subject to FERC regulation) and **intrastate service** (subject to PUC regulation) and that common pleas did not err when it overruled Condemnees' Preliminary Objection. FERC's decision in <u>Amoco</u> and the other authority previously discussed support this conclusion. Condemnees apparently do not accept that the service at issue can be both interstate and intrastate, and the cases they cite are not on point as they address general principles of interstate commerce and/or transport of natural gas.[18] Moreover, PUC Orders related to the Mariner East Project and the testimony before common pleas establishes that the Mariner East 2 pipeline will provide both **interstate and intrastate service**. (R.R. at 49a, 53a-54a, 61a-62a, 66a, 68a, 72a-73a, 118a-19a, 657a, 659a, 1336a, 1339a, 1344a, 1378a.)

The record establishes that the Mariner East 2 pipeline will consist of a physical structure with access points in Ohio, West Virginia, and Pennsylvania. Product will be **placed into the pipeline and removed at multiple points within Pennsylvania**.[19] (R.R. at 945a.) In addition, Sunoco has filed, and received PUC approval, of multiple tariffs applicable to Sunoco's provision of intrastate service through the Mariner East Project, including the use of Mariner East 2. (<u>See</u> <u>supra</u>

---

[18] <u>See</u>, <u>e.g.</u>, <u>Maryland v. Louisiana</u>, 451 U.S. 725 (1981) (for purposes of evaluating effect under the Commerce Clause of state tax, natural gas flowing from Gulf of Mexico in pipelines through Louisiana to up to 30 other states does not lose interstate character even if processing to remove NGLs takes place in Louisiana); <u>California v. Lo-Vaca Gathering Co.</u>, 379 U.S. 366 (1965) (sale of gas which crosses a state line at any stage of its movement from wellhead to ultimate consumption is in interstate commerce within the meaning of the Natural Gas Act).

[19] Testimony shows that on-loading in Pennsylvania will occur in Independence Township (Washington County), Houston (Washington County), Delmont (Westmoreland County), and Mechanicsburg (Cumberland County). (R.R. at 1340a.) Off-loading points in Pennsylvania are in Mechanicsburg, Schaefferstown (Lebanon County), Montello (Berks County), and Twin Oaks (Delaware County). (R.R. at 1341a.)

note 10.) As we noted, under Section 1302 of the Code, authority to file a tariff is limited to a public utility regulated by PUC. We thus conclude that Sunoco is a public utility corporation empowered to exercise eminent domain under Section 1511 of the BCL, and that common pleas did not err when it overruled Condemnees' Preliminary Objection that the Mariner East 2 pipeline was an interstate pipeline and not an intrastate pipeline.

### C. PUC Regulation of Mariner East 2 Service

Condemnees next argue that common pleas erred when it concluded that the Mariner East 2 pipeline provides service regulated by PUC. There are two related prongs to Condemnees' argument: that PUC Orders do not cover service on the Mariner East 2 pipeline; and, that PUC did not issue a CPC for Mariner East 2 because it provides interstate commerce. Common pleas found both of these arguments unpersuasive.

The record reflects that Sunoco, on June 9, 2014, applied to PUC to expand its service territory for the Mariner East Project, including Mariner East 2, into Washington County, the only service territory not previously certificated for Mariner East service by prior CPCs. (R.R. at 60a.) By Order dated August 21, 2014, PUC granted the application authorizing Sunoco's provision of intrastate petroleum and refined petroleum products pipeline transportation service in Washington County thus expanding Sunoco's service territory for its Mariner East service. (R.R. at 59a-64a.) PUC's Order accompanying the CPC described the authorized service, and specifically described Mariner East 2 service as an expansion of existing Mariner East 1 service. (R.R. at 61a.) The result of this Order is that **PUC authorized Mariner East 1 and Mariner East 2 intrastate**

27

**service in 17 counties**, from Washington County in western Pennsylvania, through 15 other counties, including **Cumberland County**, to Delaware County in eastern Pennsylvania. (R.R. at 1637a.)

Subsequently, in its October 29, 2014 Order, PUC stated that:

> [T]his authority [under existing CPCs] **is not limited to a specific pipe or set of pipes, but rather, includes both the upgrading of current facilities and the expansion of existing capacity** as needed for the provision of the authorized service within a certificated territory.

(R.R. at 122a (emphasis added).) From these PUC Orders we conclude that Sunoco's CPCs apply to **both** Mariner East 1 service **and to Mariner East 2 service**, as it is an authorized expansion of the same service. (R.R. at 657a-59a, 1344a, 1377a.) In addition, Sunoco's approved tariffs proposed to add the new origin point of Houston, Washington County for west-to-east intrastate movements of propane, based on the CPCs issued. (R.R. at 66a.) On these bases, we hold that common pleas did not err when it concluded that "PUC regulates intrastate shipments of NGL[s,]" including service provided by Mariner East 2, and that "[a]s a result, [Sunoco] has the power of eminent domain to condemn property for the construction of [Mariner East 2]." (December 22, 2015 Op. at 4.)

### D.    Demonstration of Public Need

Condemnees' final argument is that common pleas erred when it overruled the Preliminary Objections and approved a pipeline where no public need was demonstrated. According to Condemnees, PUC approval of a service is only a preliminary step, and it was common pleas' responsibility to review the public

28

need and to make a determination of the scope and validity of the condemnation for the Mariner East 2 pipeline.

PUC filed an amicus brief solely addressing this issue.[20] PUC expresses concern that Condemnees' argument, if credited, would permit eminent domain litigants to challenge the validity of PUC-issued CPCs before courts of common pleas, which would constitute impermissible collateral attacks on otherwise valid PUC orders and raises serious jurisdictional concerns. PUC argues, as does Sunoco, that the CPCs Sunoco obtained through its acquisition of Sun and Atlantic were for an integrated pipeline system and not a single pipeline, and that PUC's October 29, 2014 Order confirms that Sunoco's intrastate transportation of propane and other petroleum hydrocarbons is within its existing certificated authority for petroleum and petroleum products. PUC cites the same history we detailed above to establish that it, on numerous occasions, has asserted its regulatory authority over Sunoco and its public utility service on the Mariner East system.

### 1. PUC has statewide jurisdiction over public utilities

Initially, we observe that the Code charges PUC with responsibility to determine which entities are public utilities and to regulate how public utilities provide public utility service. This has long been the statutory mandate. See, e.g., Pottsville Union Traction Co. v. Pennsylvania Public Service Comm'n, 67 Pa. Super. 301 (1917). It is beyond purview that the General Assembly intended PUC to have statewide jurisdiction over public utilities and to foreclose local public

---

[20] PUC takes no position regarding the affirmance or reversal of common pleas' decision or whether Sunoco appropriately exercised eminent domain authority against Condemnees' real property interests.

utility regulation.  Duquesne Light Co. v. Monroeville Borough, 298 A.2d 252 (Pa. 1972).

As previously described, in the public utility context, an entity must meet separate but related requirements set forth in both the BCL and the Code to be a public utility corporation clothed with the power of eminent domain.  Section 1511(a)(2) of the BCL provides that "public utility corporations" may exercise the power of eminent domain to condemn property for the transportation of, *inter alia*, natural gas and petroleum products.  Section 1103 of the BCL defines public utility corporation  as "[a]ny domestic or foreign corporation for profit that  . . . is subject to regulation as a public utility by the [PUC] . . . ."  15 Pa. C.S. § 1103.  Section 1104 of the Code requires that a public utility must possess a CPC issued by PUC pursuant to Section 1101 of the Code before exercising eminent domain.  While courts of common pleas have jurisdiction to review whether an entity attempting to exercise eminent domain power meets the BCL criteria, that jurisdiction does not include the authority to revisit PUC adjudications.  A CPC issued by PUC is prima facie evidence that PUC has determined that there is a public need for the proposed service and that the holder is clothed with the eminent domain power.  This Court has stated "[t]he administrative system of this Commonwealth would be thrown into chaos if we were to hold that agency decisions, reviewable by law by the Commonwealth Court, are also susceptible to collateral attack in equity in the numerous common pleas courts."  Aitkenhead v. Borough of West View, 442 A.2d 364, 367 n.5 (Pa. Cmwlth. 1982).

30

## 2. The Eminent Domain Code governs the scope and validity of a taking, and not public need

The Eminent Domain Code[21] governs process and procedure in condemnation proceedings. Section 306 of the Eminent Domain Code provides in pertinent part that:

**§ 306. Preliminary objections.**

**(a)** *Filing and exclusive method of challenging certain matters.--*

**(1)** Within 30 days after being served with notice of condemnation, the condemnee may file preliminary objections to the declaration of taking.
**(2)** The court upon cause shown may extend the time for filing preliminary objections.
**(3)** Preliminary objections shall be limited to and shall be the exclusive method of challenging:

**(i)** The power or right of the condemnor to appropriate the condemned property unless it has been previously adjudicated.
**(ii)** The sufficiency of the security.
**(iii)** The declaration of taking.
**(iv)** Any other procedure followed by the condemnor.

26 Pa. C.S. § 306(a).

The Eminent Domain Code does not permit common pleas to review the public need for a proposed service by a public utility that has been authorized by PUC through the issuance of a CPC. In <u>Fairview Water Co. v. Public Utility Comm'n</u>, 502 A.2d 162 (Pa. 1985), our Supreme Court discussed the proper forum for a condemnee's challenge to the legality of a taking when a public utility attempts to condemn an easement and PUC has determined that condemnee's

---

[21] 26 Pa. C.S. §§ 101-1106.

31

property is necessary for the utility service. The case stemmed from a dispute between Fairview and a power company over the power company's continuing use of an easement previously agreed to by the parties. Id. at 163. The power company filed an application with PUC requesting a finding and determination that its transmission line was necessary and proper for the service, accommodation, convenience, or safety of the public. A PUC Administrative Law Judge determined that the service was necessary and proper and also determined the scope and validity of the easement. This court affirmed. On appeal, Fairview argued that PUC lacked jurisdiction to determine the scope and validity of the easement. Id. at 163-64. The Supreme Court agreed and stated: "[o]nce there has been a determination by the PUC that the proposed service is necessary and proper, the issues of scope and validity and damages must be determined by a Court of Common Pleas exercising equity jurisdiction." Id. at 167. As Sunoco here holds CPCs issued by PUC and PUC in its Orders issuing the CPCs found the authorized service to be necessary and proper, it is left to common pleas to evaluate scope and validity of the easement, but not the public need.

As illustrated by Fairview, determinations of public need for a proposed utility service are made by PUC, not the courts. Section 1103 of the Code requires an applicant for a CPC to establish that the proposed service is "necessary or proper for the service, accommodation, convenience, or safety of the public." 66 Pa. C.S. § 1103(a). Under this section, the applicant must "demonstrate a **public need or demand for the proposed service** . . . ." Chester Water Auth. v. Public Utility Comm'n, 868 A.2d 384, 386 (Pa. 2005) (emphasis added).[22]

---

[22] Condemnees cite several decisions for the proposition that "[t]he Court must … review whether Mariner East 2 pipeline satisfies the public purpose test." (Condemnees' Br. at 26-27.)

*(Continued…)*

In this case, PUC in its July 24, 2014 Order held that Sunoco's proposed intrastate propane service would result in "numerous potential public benefits" by allowing Sunoco "to immediately address the need for uninterrupted deliveries of propane in Pennsylvania and to ensure that there is adequate pipeline capacity to meet peak demand for propane during the winter heating season." (R.R. at 49a-50a.) Further, in granting Sunoco's CPC application to extend its service territory into Washington County, PUC stated:

> [W]e believe that approval of this Application **is necessary and proper for the service, accommodation, and convenience of the public**. We believe granting Sunoco authority to commence **intrastate transportation of propane** in Washington County will enhance delivery options for the transport of natural gas and **natural gas liquids in Pennsylvania**. In the wake of the propane shortage experienced in 2014, Sunoco's proposed service will increase the supply of propane in markets with a demand for these resources, including in Pennsylvania, **ensuring that Pennsylvania's citizens enjoy access to propane heating fuel**. Additionally, the proposed service will offer a safer and more economic transportation alternative for shippers to existing rail and trucking services.

(R.R. at 63a (emphasis added).)

Here, both PUC and common pleas followed their statutory mandates and evaluated the issues within their respective purviews. There is no basis for a common pleas court to review a PUC determination of public need. In fact, to allow such review would permit collateral attacks on PUC decisions and be

---

However, none of the cases cited support the proposition that common pleas may review a public utility's CPC in an eminent domain context because those cases involve appellate review of PUC decisions related to public need for a particular service, not court decisions involving eminent domain.

33

contrary to Section 763 of the Judicial Code, 42 Pa. C.S. § 763, which places review of PUC decisions within the jurisdiction of this Court.

For these reasons, we conclude that common pleas did not err when it overruled Condemnees' Preliminary Objections to Sunoco's Declarations of Taking. We further conclude that Sunoco is regulated as a public utility by PUC and is a public utility corporation, and Mariner East intrastate service is a public utility service rendered by Sunoco within the meaning of the BCL, 15 Pa. C.S. §§ 1103, 1511. The September 29, 2015 Order of the Court of Common Pleas of Cumberland County is hereby affirmed.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: Condemnation By Sunoco Pipeline, L.P. of Permanent and Temporary Rights of Way for the Transportation of Ethane, Propane, Liquid Petroleum Gas, and other Petroleum Products in the Township of North Middleton, Cumberland County, Pennsylvania, over the Lands of R. Scott Martin and Pamela S. Martin | : : : : : : : : : : : | |
| | : | No. 1979 C.D. 2015 |
| | : | |
| Appeal of: R. Scott Martin and Pamela S. Martin | : : : | |
| | : | |
| In Re: Condemnation By Sunoco Pipeline, L.P. of Permanent and Temporary Rights of Way for the Transportation of Ethane, Propane, Liquid Petroleum Gas, and other Petroleum Products in the Township of North Middleton, Cumberland County, Pennsylvania, over the Lands of Douglas M. Fitzgerald and Lyndsey M. Fitzgerald | : : : : : : : : : : : | |
| | : | No. 1980 C.D. 2015 |
| | : | |
| Appeal of: Douglas M. Fitzgerald and Lyndsey M. Fitzgerald | : : : | |
| | : | |
| In Re: Condemnation by Sunoco Pipeline, L.P. of Permanent and Temporary Rights of Way for the Transportation of Ethane, Propane, Liquid Petroleum Gas, and other Petroleum Products in the Township of North Middleton, Cumberland County, Pennsylvania, over the Lands of Harvey A. Nickey and Anna M. Nickey | : : : : : : : : : : : | |
| | : | No. 1981 C.D. 2015 |
| | : | |
| Appeal of: Harvey A. Nickey and Anna M. Nickey | : : | |

# **O R D E R**

**NOW**, this 14th day of July, 2016, the September 29, 2015 Order of the Court of Common Pleas of Cumberland County is hereby AFFIRMED.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Condemnation By Sunoco
Pipeline, L.P. of Permanent and
Temporary Rights of Way for the
Transportation of Ethane, Propane,
Liquid Petroleum Gas, and other
Petroleum Products in the Township of
North Middleton, Cumberland County,
Pennsylvania, over the Land of R. Scott
Martin and Pamela S. Martin

Appeal of: R. Scott Martin and
Pamela S. Martin

No. 1979 C.D. 2015

In Re: Condemnation By Sunoco
Pipeline, L.P. of Permanent and
Temporary Rights of Way for the
Transportation of Ethane, Propane,
Liquid Petroleum Gas, and other
Petroleum Products in the Township
of North Middleton, Cumberland
County, Pennsylvania, over the
Lands of Douglas M. Fitzgerald and
Lyndsey M. Fitzgerald

Appeal of: Douglas M. Fitzgerald
and Lyndsey M. Fitzgerald

No. 1980 C.D. 2015

In Re: Condemnation by Sunoco
Pipeline, L.P. of Permanent and
Temporary Rights of Way for the
Transportation of Ethane, Propane,
Liquid Petroleum Gas, and other
Petroleum Products in the Township
of North Middleton, Cumberland
County, Pennsylvania, over the
Lands of Harvey A. Nickey and
Anna M. Nickey

No. 1981 C.D. 2015
Argued: March 9, 2016

Appeal of: Harvey A. Nickey and
Anna M. Nickey

**BEFORE:** HONORABLE MARY HANNAH LEAVITT, President Judge
HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE ROBERT SIMPSON, Judge
HONORABLE P. KEVIN BROBSON, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE MICHAEL H. WOJCIK, Judge

**DISSENTING OPINION**
**BY JUDGE BROBSON**            **FILED: July 14, 2016**

> Government is instituted to protect property of every
> sort; as well that which lies in the various rights of
> individuals, as that which the term particularly expresses.
> This being the end of government, that alone is a *just*
> government, which *impartially* secures to every man,
> whatever is his *own*.
>
> ~ James Madison[1]

Private property rights have long been afforded especial protection in this Commonwealth. For that reason, the law of our Commonwealth requires that courts closely scrutinize the exercise of eminent domain. Eminent domain is a privilege conferred by the General Assembly, while property ownership is a right of our citizens protected by the United States Constitution and the Pennsylvania Constitution. As between the privilege and the right, the right is paramount. I cannot improve upon the words of our Pennsylvania Supreme Court from 1866:

> The right of the Commonwealth to take private
> property with out (sic) the owner's assent on
> compensation made, or authorize it to be taken, exists in
> her sovereign right of eminent domain, and can never be
> lawfully exercised but for a public purpose—supposed

---

[1] James Madison, *Property*, *in The Founders' Constitution* I:598 (Philip Kurland and Ralph Lerner eds., Chicago: Univ. of Chicago Press 1987) (emphasis in original).

and intended to benefit the public, either mediately or immediately. The power arises out of that natural principle which teaches that private convenience must yield to the public wants. *This public interest must lie at the basis of the exercise, or it would be confiscation and usurpation to exercise it.* This being the reason for the exercise of such a power, it requires no argument to prove that after the right has been exercised the use of the property must be held in accordance with and for the purposes which justified its taking. Otherwise it would be a fraud on the owner, and an abuse of power. . . . The exercise of the right of eminent domain, whether directly by the state or its authorized grantee, is necessarily in derogation of private right, and *the rule in that case is, that the authority is to be strictly construed*[.] What is not granted is not to be exercised.

*Lance's Appeal*, 55 Pa. 16, 25-26 (1866) (citations omitted) (emphasis added); *see Winger v. Aires*, 89 A.2d 521, 523 (Pa. 1952). With respect to the exercise of eminent domain, this Court's duty is clear: "[T]he court of original appellate jurisdiction has the responsibility, in the first instance, to review Appellants' preserved and colorable arguments, and any decision to affirm the taking of their property should be closely reasoned." *In re Opening a Private Road (O'Reilly)*, 5 A.3d 246, 258-59 (Pa. 2010).

At issue in this case is the effort of a publicly-traded company—Appellee Sunoco Pipeline, L.P. (Sunoco)—to take the private property of citizens in Cumberland County, Pennsylvania (Property Owners), for the purpose of constructing a portion of an underground pipeline, which is a component of a project that Sunoco has dubbed Mariner East 2 (ME2).[2] This proposed pipeline

---

[2] Although Sunoco disputes that ME2 is an actual reference to the pipeline in question, unless the context indicates otherwise, I will use ME2 to refer to the proposed pipeline.

will have the capacity to provide for both the interstate transportation of natural gas liquids (NGLs) from Ohio and West Virginia to Pennsylvania and the intrastate transportation of NGLs within Pennsylvania.[3] The pipeline will terminate at Sunoco's Marcus Hook Industrial Complex, Delaware County, Pennsylvania (Marcus Hook IC). Although the majority's decision affirming the taking is well-reasoned, I believe that Property Owners have raised a substantial and critical mixed issue of fact and law that must be resolved before *any* court places its imprimatur on the proposed takings. I thus respectfully dissent.

Sunoco's legislative authority to take private property in the Commonwealth through eminent domain in order to construct an underground pipeline emanates from the Business Corporation Law of 1988 (BCL), which provides:

> **(a) General rule.--**A public utility corporation shall, in addition to any other power of eminent domain conferred by any other statute, have the right to take, occupy and condemn property for one or more of the following *principal purposes* and ancillary purposes reasonably necessary or appropriate for the accomplishment of the *principal purposes*:
>
> . . . .
>
> (2) The transportation of artificial or natural gas, electricity, petroleum or petroleum products or water or any combination of such substances *for the public*.

---

[3] NGLs are byproducts of natural gas production compressed into liquid form. They include pentane, propane, butane, isobutene, and ethane.

15 Pa. C.S. § 1511(a)(2) (emphasis added).  When interpreting a statute, this Court is guided by the Statutory Construction Act of 1972, 1 Pa. C.S. §§ 1501-1991, which provides that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly."  1 Pa. C.S. § 1921(a).  "The clearest indication of legislative intent is generally the plain language of a statute." *Walker v. Eleby*, 842 A.2d 389, 400 (Pa. 2004).  "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."  1 Pa. C.S. § 1921(b).  Only "[w]hen the words of the statute are not explicit" may this Court resort to statutory construction.  1 Pa. C.S. § 1921(c).  "A statute is ambiguous or unclear if its language is subject to two or more reasonable interpretations." *Bethenergy Mines, Inc. v. Dep't of Envtl. Prot.*, 676 A.2d 711, 715 (Pa. Cmwlth.), *appeal denied*, 685 A.2d 547 (Pa. 1996).  Moreover, "[e]very statute shall be construed, if possible, to give effect to all its provisions."  1 Pa. C.S. § 1921(a).  It is presumed "[t]hat the General Assembly intends the entire statute to be effective and certain." 1 Pa. C.S. § 1922(2).  Thus, no provision of a statute shall be "reduced to mere surplusage." *Walker*, 842 A.2d at 400.  Finally, it is presumed "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable."  1 Pa. C.S. § 1922(1).

Applying these principles of statutory construction to the eminent domain provision for public utility corporations in the BCL, the intent of the General Assembly is clear and unambiguous.  A public utility corporation may use eminent domain to construct a facility, such as a pipeline, so long as the "principal purpose" of the facility is the transportation of the petroleum product, in this case NGLs, "for the public."  This "public use" condition in the BCL is coextensive

with property rights conferred and protected by the United States and Pennsylvania Constitutions.  Specifically, the Declaration of Rights in the Pennsylvania Constitution both authorizes and limits the use of eminent domain:  "No person shall, for the same offense, be twice put in jeopardy of life or limb; nor shall private property be taken or applied *to public use,* without authority of law and without just compensation being first made or secured."  Pa. Const. art. I, § 10 (emphasis added).  The proper and lawful exercise of eminent domain under the Declaration of Rights, then, is evidenced by (1) authority of law (*i.e.*, legislation, such as the BCL), (2) just compensation, and (3) the taking of property for "public use."  In addition, Article X, section 4 of the Pennsylvania Constitution addresses use of eminent domain by municipal and other corporations.  Like Section 10 of the Declaration of Rights, Article X, section 4 recognizes the power of eminent domain only with respect to the "taking [of] private property for *public use.*"  Pa. Const. art. X, § 4 (emphasis added).

In the context of eminent domain, courts have used the phrases "public use" and "public purpose" interchangeably.  In *Kelo v. City of New London*, 545 U.S. 469 (2005), a sharply-divided United States Supreme Court, interpreting the Takings Clause of the Fifth Amendment to the United States Constitution,[4] held that the taking of private property in furtherance of a community economic development plan by a private entity furthered a "public purpose" and thus was a valid "public use" for eminent domain purposes.  Critics of the *Kelo* majority have contended that the majority applied an overly-broad

_____

[4] The Takings Clause of the Fifth Amendment prohibits that taking of "private property . . . for *public use,* without just compensation."  U.S. Const. amend. V (emphasis added).

PKB-5

interpretation of the phrase "public use," opening the door for eminent domain takings that serve virtually any "public purpose."[5]  This Court need not enter into this debate, however, because in cases involving the taking of private property by eminent domain (or like authority), the Pennsylvania Supreme Court has interpreted both "public use" and "public purpose" narrowly in favor of the private property interests of the landowner.

In *Middletown Township v. Lands of Stone*, 939 A.2d 331 (Pa. 2007), a post-*Kelo* decision, the Pennsylvania Supreme Court held that Middletown Township could exercise its eminent domain power under Section 2201 of The Second Class Township Code[6] to take private farm land for recreational purposes. The authorizing statute provides:

> The board of supervisors may designate lands or buildings owned, leased or controlled by the township for use as parks, playgrounds, playfields, gymnasiums, swimming pools, indoor recreation centers, public parks and other recreation areas and facilities *and acquire lands or buildings by lease, gift, devise, purchase or by the exercise of the right of eminent domain for recreational purposes* and construct and equip facilities for recreational purposes.

Section 2201 of The Second Class Township Code (emphasis added).  The Supreme Court next considered whether Middletown Township acted within the

---

[5] *See, e.g.*, Ilya Somin, *The Grasping Hand: Kelo v. City of New London and the Limits of Eminent Domain* 73 (2015); Brent Nicholson and Sue Ann Mota, *From Public Use to Public Purpose: The Supreme Court Stretches the Takings Clause in* Kelo v. City of New London, 41:1 Gonz. L. Rev. 81 (2005).

[6] Act of May 1, 1933, P.L. 103, *as amended*, 53 P.S. § 67201.

scope of this statutory authority when it sought to take by eminent domain a 175-acre farm in Bucks County.

Although Section 2201 of The Second Class Township Code does not expressly use the phrase "public use," the Supreme Court opined that in light of the Takings Clause of the Fifth Amendment to the United States Constitution, "the only means of validly overcoming the private right of property ownership . . . is to take for '*public use.*' In other words, without a *public purpose*, there is no authority to take property from private owners." *Lands of Stone*, 939 A.2d at 337 (citation omitted) (quoting U.S. Const. amend. V) (emphasis added). As for the appropriate inquiry, the Supreme Court opined:

> According to our Court, "a taking will be seen as having a public purpose only where the public is to be the primary and paramount beneficiary of its exercise." In considering whether a primary public purpose was properly invoked, this Court has looked for the "real or fundamental purpose" behind a taking. Stated otherwise, the **true** purpose must primarily benefit the public. . . .
>
> This means that the government is not free to give mere lip service to its authorized purpose or to act precipitously and offer retroactive justification. . . . Clearly, evidence of a well-developed plan of proper scope is significant proof that an authorized purpose truly motivates a taking.
>
>     . . . .
>
>     . . . Because the law requires that the true purpose of the taking be recreational, it is not sufficient that some part of the record support that recreational purposes were put forth. But rather, in order to uphold the invocation of the power of eminent domain, this Court must find that the recreational purpose was real and fundamental, not post-hoc or pre-textual.

*Id.* at 337-38 (citation omitted) (quoting *In re Bruce Ave.*, 266 A.2d 96 (Pa. 1970), and *Belovsky v. Redevelopment Auth.*, 54 A.2d 277 (Pa. 1947)) (emphasis in original).

The Supreme Court then proceeded to examine the common pleas court's factual findings to determine whether the "true purpose" of the proposed taking in *Lands of Stone* was for the statutorily-authorized purpose—*i.e.*, recreational use. The Supreme Court concluded that the common pleas court's factual findings did not support the taking. The Supreme Court noted that the plan on which Middletown Township's taking was premised did not at all provide for use of the farm property for recreational purposes. *Id.* at 339. The Supreme Court also rejected as insignificant Middletown Township's consideration of various recreational options for the property, each of which the Supreme Court found problematic from a "public use" and necessity perspective. *Id.* Finally, the Supreme Court rejected the common pleas court's finding that Middletown Township "might" use portions of the property for passive recreation, noting the absence of any record evidence to support this finding. *Id.* The Supreme Court concluded:

> It is clear that in order to invoke that power [of eminent domain], it was incumbent upon the Township to identify the fact that it could take for a recreational purpose and to take action to effectuate that purpose. Further, as stated previously, precedent demonstrates that condemnations have been consistently upheld when the taking is orchestrated according to a carefully developed plan which effectuates the stated purpose. Anything less would make an empty shell of our public use requirements. It cannot be sufficient to merely wave the proper statutory language like a scepter under the nose of a property owner and demand that he forfeit his land for the sake of the public. Rather, there must be some substantial and rational proof by way of an intelligent

> plan that demonstrates informed judgment to prove that an authorized public purpose is the true goal of the taking.
>
> The record does not support any finding of a condemnation proceeding informed by intelligent judgment or a concrete plan to use the Stone farm for the authorized purpose of recreation . . . .

*Id.* at 340 (citations omitted). Accordingly, the Supreme Court held that the common pleas court erred in overruling the preliminary objections to the taking. *Id.*

The Pennsylvania Supreme Court revisited the power of eminent domain a few years later, when it considered a constitutional challenge to the Private Road Act.[7] The Private Road Act allows a landowner to petition the court of common pleas to appoint a board of viewers to consider the necessity of a private road to connect landlocked property with the nearest public thoroughfare. Like eminent domain, the landowner who is successful under the Private Road Act must compensate the person over whose property the private road is built. In *In re Opening a Private Road (O'Reilly)*, 5 A.3d 246 (Pa. 2010), the challengers contended that the Private Road Act authorized the taking of private property for private purposes in violation of the United States and Pennsylvania Constitutions.

The Supreme Court, agreeing with the challengers, opined that the Private Road Act provides for a government taking of private property in the constitutional sense. *O'Reilly*, 5 A.3d at 257. The Supreme Court held that any effort by the General Assembly to vest within an individual or nongovernmental entity the right to take private property for its own use must constitute "a valid

---

[7] Act of June 13, 1836, P.L. 551, *as amended*, 36 P.S. §§ 2731-2891.

exercise of the power of eminent domain." *Id.* In this Court's majority opinion on review by the Supreme Court in *O'Reilly*, we articulated a public benefit behind the private road in question:

> [E]ven if we were to use a traditional takings analysis to determine the constitutionality of the [Private] Road Act, a public purpose is served by allowing the laying out of roads over the land of another. Although the private property owner who petitioned for the private road certainly gains from the opening of the road, the public gains because otherwise inaccessible swaths of land in Pennsylvania would remain fallow and unproductive, whether to farm, timber or log for residences, making that land virtually worthless and not contributing to commerce or the tax base of this Commonwealth. All of this, plus the fact that private roads are considered part of the road system of Pennsylvania, *equate with the conclusion that a public purpose is served by the Private Road Act provisions that allow for the taking of property of another for a private road to give access to landlocked property.*

*In re Opening a Private Road (O'Reilly)*, 954 A.2d 57, 72 (Pa. Cmwlth. 2008) (en banc) (emphasis added), *vacated and remanded*, 5 A.3d 246 (Pa. 2010). The Supreme Court, however, found this articulation of a public purpose, or benefit, inadequate to support a taking. Instead, the test, as articulated in *Lands of Stone*, requires that "the public must be the primary and paramount beneficiary of the taking." *O'Reilly*, 5 A.3d at 258 (citing *Lands of Stone*, 939 A.2d at 337). The Supreme Court, therefore, vacated this Court's decision and remanded the case for further proceedings consistent with its decision—*i.e.*, to apply the proper test.

In their preliminary objections below and on appeal, Property Owners note that when Sunoco presented this very same pipeline facility—ME2—to the Court of Common Pleas of York County (York County court), Sunoco maintained that the sole purpose of the pipeline was for the interstate transportation of all types

of NGLs (ethane, propane, liquid petroleum, gas, and others) for Sunoco's customers. In its February 25, 2014 Opinion Denying Motion for Immediate Right of Entry, the York County court,[8] accepting Sunoco's represented purpose for constructing the pipeline, held that the facility was *not* an act in furtherance of Sunoco's PUC authority, but, rather, was an act in furtherance of interstate commerce, regulated by the Federal Energy Regulatory Commission (FERC) pursuant to the Interstate Commerce Act. (Reproduced Record (R.R.) 484a-89a.) Under such circumstances, according to the York County court, Sunoco's power of eminent domain as a public utility corporation under the BCL was not triggered.

Sunoco, through PUC-issued certificates of public convenience, is authorized to offer, furnish, or supply intrastate petroleum and refined petroleum products pipeline service.[9] The particular NGL that is the subject of this PUC authority is propane, which many in the Commonwealth use as fuel for heating. (R.R. 60a-64a.)[10] At the time the York County court issued its decision, however, Sunoco <u>did not</u> have PUC authority to offer that intrastate public utility service from Pennsylvanian's western-most border to Pennsylvania's eastern-most border. In western Pennsylvania, that authority stopped at Westmoreland County. In

---

[8] *Sunoco Pipeline, L.P. v. Loper* (C.P. York, 2013-SU-4518-05, filed February 25, 2014) (*reaffirmed* March 25, 2014).

[9] The definition of "public utility" in the Public Utility Code includes a person or corporation that owns or operates facilities in the Commonwealth for: "transporting or conveying . . . petroleum products . . . for the public for compensation." 66 Pa. C.S. § 102. Although the Public Utility Code does not define "petroleum product," the PUC, in its *amicus curiae* brief, notes that PUC considers propane a "petroleum product." (PUC Br. at 6-7.)

[10] In an October 29, 2014 decision, the PUC concluded that Sunoco's authority also extended to pipeline service for the intrastate transportation of ethane. (R.R. 120a-22a.)

addition, as revealed below, Sunoco had suspended/abandoned intrastate service in some parts of the Commonwealth before pursuing the taking in York County.

Following the York County court's decision, Sunoco filed two applications with the PUC relating to ME2. The first, filed on May 21, 2014, sought "clarification" of a prior PUC Order (issued August 29, 2013), which granted Sunoco the authority to suspend and abandon public utility service in certain portions of its authorized territory. The PUC granted that application by order dated July 24, 2014. (R.R. 191a-201a.) In its disposition, the PUC noted a change of circumstances that prompted its reconsideration of the prior order authorizing suspension and abandonment of service:

> We conclude that Sunoco has identified new considerations in its Petition, based on its averments that the circumstances surrounding the Mariner East Pipeline project have changed since the issuance of the *August 2013 Order*. When we approved Sunoco's Abandonment Application, the Company did not intend to provide intrastate service within Pennsylvania from the Mariner East Pipeline and planned to provide only intrastate transportation of ethane and propane from west-to-east to the [Marcus Hook IC]. *August 2013 Order at 3*. The Company's plans have since changed due to the increased demand for intrastate transportation of propane, and Sunoco now intends to offer intrastate propane service in response to the increased shipper interest in securing intrastate pipeline facilities.

(R.R. 198a-99a.) In granting Sunoco's application for clarification, the PUC confirmed that Sunoco retained its authority to provide intrastate public utility service through its certificates of public convenience in the previously abandoned service areas and clarified the procedures that Sunoco must follow to resume pipeline transportation services for petroleum products in those areas. (R.R. 200a-01a.)

On June 9, 2014, Sunoco applied to the PUC for authority to extend its authorized service to the public in Washington County, Pennsylvania—a border county with West Virginia. The PUC approved that request in August 2014. (*Id.*) With that decision, Sunoco, for the first time, had PUC authority to provide public utility service in the form of pipeline transportation of petroleum products in Pennsylvania as far east as Delaware County and as far west as Washington County.

As noted above, Sunoco relied solely on the *interstate* component, or purpose, of ME2 in the York County court proceeding (*Loper*). On or about July 21, 2015, Sunoco filed the three Declarations of Taking in the Court of Common Pleas of Cumberland County, Pennsylvania (trial court), that are at issue in this appeal. In the Declarations of Taking, in the proceedings below, and in this appeal, Sunoco emphasizes its PUC authority and the *intrastate* service that ME2 will provide to those in Pennsylvania who benefit from that regulated service. As it did in its May 21, 2014 application to the PUC, Sunoco acknowledges in the Declarations of Taking that the renewed focus on *intrastate* supply of petroleum products occurred at or around the time of the York County court's decision in *Loper*:

> During and following the 2013-2014 winter season, Sunoco Pipeline experiences a significant increase in shipper demand for *intrastate* shipments of propane due to an increase in local consumer demand for propane. These changes in market conditions were due to propane shortages caused by the harsh winter conditions and a deficit in pipeline infrastructure. The resulting price spikes and shortages prompted unprecedented emergency measures from both the state and federal governments. In reaction to the unfolding market conditions and shipper interest, Sunoco Pipeline accelerated its business plans to provide *intrastate*

shipments of propane within the Commonwealth, in addition to interstate shipments of propane and ethane.

(R.R. 159a-60a (emphasis in original).) Absent from the Declarations of Taking, however, are any allegations that this new emphasis on the intrastate supply of propane to people within the Commonwealth is, as the Supreme Court phrased in *Lands of Stone*, the "true" purpose behind the taking.[11]

With this background, Property Owners are justifiably skeptical. At base, Property Owners contend that nothing of material moment has changed in terms of Sunoco's purpose for constructing and its intended use of ME2. Counsel for Property Owners questioned Curtis M. Stambaugh, Esquire, Sunoco's Assistant General Counsel, about this issue at the hearing on the preliminary objections below:

> Q. And at that point [in a brief filed by Sunoco in the York County matter] doesn't your Sunoco brief indicate that the Pennsylvania Public Utility Commission has no jurisdiction to regulate the pipeline because it is an interstate line not an intrastate line?
>
> A. Yes, sir, I do. As you are aware from the four hearings we've already had where you've been counsel on the opposite side, we have repeatedly testified that in 2014 the initial plan was for interstate service only. After the polar vortex that changed to contemplate both inter and intrastate, that is actually the reason why we need to go get the Certificate of Public Convenience to include Washington County from the Public Utility Commission.

_____

[11] Sunoco argues that the ME2 project always contemplated an intrastate component. For purposes of this dissent, I accept that claim. The question that remains is whether that intrastate component is the "true" purpose behind the construction of the pipeline.

Q. After the polar vortex and after this [York County] decision, was Mariner East 2 still an interstate pipeline?

A. It is both, yes, sir, inter and intrastate.

Q. Continues to cross state lines? Continues to be a proposal to cross state lines?

A. Yes, sir.

(R.R. 1339a-40a.) According to Property Owners, ME2 is now what it always has been—a predominantly, if not exclusively, interstate endeavor, intended to benefit not the Pennsylvanians who require propane to heat their homes, but Sunoco's customers, who will use the pipeline to transport NGLs from parts west of Pennsylvania and within western Pennsylvania to the Marcus Hook IC for eventual use by concerns outside of Pennsylvania. Accordingly, Property Owners contend that the result before the trial court on the Declarations of Taking should have matched the result in York County.

Although the legal issue is not as clearly articulated as I would hope (or even expect) it to be, the concern of Property Owners is plain. In their Statement of the Case, Property Owners complain that Sunoco "engaged in an array of activities attempting to obtain state eminent domain power to reduce the cost of purchasing property rights," but that ME2 is still a matter of interstate commerce. The eminent domain power of the BCL is, therefore, not available, according to Property Owners. (Appellants' Br. at 5.) At page 16 of their brief, Property Owners describe Sunoco's addition of new on- and off-ramp locations along ME2 to serve intrastate service as "a faulty ploy to try to obtain eminent domain power." (*Id.* at 16.) Although Property Owners mostly couch their arguments on appeal in terms of the pipeline being interstate *and not* intrastate (the trial court found that it is both), the position that the pipeline is *not intrastate*

*enough* to trigger eminent domain authority under the BCL can also be gleaned from a fair and reasonable reading of the record below and Property Owners' arguments on appeal.

Upon review of the trial court's September 29, 2015 Order, overruling Property Owners' preliminary objections to the Declarations of Taking, and the trial court's subsequent Opinion Pursuant to Pa. R.A.P. 1925, I must conclude that the trial court's analysis of the takings at issue in this case and of Property Owners' contentions is incomplete. The trial court grounded its decision below on its factual findings that ME2, as reconfigured following the York County matter, will have the capacity to provide both interstate service regulated by FERC and intrastate service regulated by the PUC. Those findings alone, however, are inadequate to address the key legal question of whether Sunoco's "true purpose" behind the takings is to provide *intrastate* public utility service to Pennsylvanians of the type authorized and in the territories authorized by the PUC. If the courts are to allow these takings to proceed, it must be so, and not some post-hoc, retroactive, or pre-textual justification to secure land by eminent domain. Sunoco must convince the trial court, through "some substantial and rational proof," that providing PUC-authorized service "is the true goal" of taking Property Owners' land. *Lands of Stone*, 939 A.2d at 337-40. This Court cannot and should not authorize the taking of private land in this case until the trial court makes such findings and renders such a legal conclusion. At that point, we can properly exercise appellate review.

_____
P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: Condemnation By Sunoco Pipeline, L.P. of Permanent and Temporary Rights of Way for the Transportation of Ethane, Propane, Liquid Petroleum Gas, and other Petroleum Products in the Township of North Middleton, Cumberland County, Pennsylvania, over the Lands of R. Scott Martin and Pamela S. Martin | : : : : : : : : : : : | No. 1979 C.D. 2015 |
| | : | |
| Appeal of: R. Scott Martin and Pamela S. Martin | : : : | |
| | : | |
| In Re: Condemnation By Sunoco Pipeline, L.P. of Permanent and Temporary Rights of Way for the Transportation of Ethane, Propane, Liquid Petroleum Gas, and other Petroleum Products in the Township of North Middleton, Cumberland County, Pennsylvania, over the Lands of Douglas M. Fitzgerald and Lyndsey M. Fitzgerald | : : : : : : : : : : : | No. 1980 C.D. 2015 |
| | : | |
| Appeal of: Douglas M. Fitzgerald and Lyndsey M. Fitzgerald | : : : | |
| | : | |
| In Re: Condemnation By Sunoco Pipeline, L.P. of Permanent and Temporary Rights of Way for the Transportation of Ethane, Propane, Liquid Petroleum Gas, and other Petroleum Products in the Township of North Middleton, Cumberland County, Pennsylvania, over the Lands of Harvey A. Nickey and Anna M. Nickey | : : : : : : : : : : : : | No. 1981 C.D. 2015 Argued: March 9, 2016 |
| | : | |
| Appeal of: Harvey A. Nickey and Anna M. Nickey | : : | |

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE ROBERT SIMPSON, Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge


DISSENTING OPINION
BY JUDGE McCULLOUGH                         FILED: July 14, 2016


I must respectfully dissent from the thoughtful Majority decision to permit Sunoco Pipeline, L.P. (Sunoco), a publicly traded company, to confiscate the private property of R. Scott Martin and Pamela Martin, Douglas M. Fitzgerald and Lyndsey M. Fitzgerald, and Harvey A. Nickey and Anna M. Nickey (Condemnees). After reviewing the procedural history of this matter, I am concerned that Sunoco is trying to avoid what may be the collateral estoppel effect of a decision adverse to its interests rendered by the Court of Common Pleas of York County and to utilize the sovereign power of eminent domain to take Condemnee's property for its exclusively private benefit.

Specifically, in recent proceedings before the Court of Common Pleas of York County, Sunoco represented that the same pipeline facility that is at issue here, known as the Mariner East 2 pipeline or ME2, was for **interstate** transportation of all types of natural gas liquids (NGLs). Based on that representation, the common pleas court quite properly determined that ME2 was not in furtherance of Sunoco's Public Utility Commission (PUC) authority and, hence, Sunoco could not assert eminent domain powers under the guise of an intrastate public utility corporation and in accordance with section 1511(a) of the

Business Corporation Law of 1988, 15 Pa.C.S. §1511(a).  *See Sunoco Pipeline, L.P. v. Loper* (York County C.P., No. 2013-SU-4518-05, filed February 24, 2014) (reaffirmed March 25, 2014).

Rather than appeal the decision in *Loper*, Sunoco, in May of 2014, less than two months after that decision, sought, and subsequently obtained, a "clarification" from the PUC to re-assert intrastate service after Sunoco had previously obtained PUC approval to abandon such service less than a year before as set forth in a PUC Order dated August 29, 2013.  Sunoco then followed up its claimed renewed intention to provide intrastate service within the Commonwealth from as far east as Delaware County to as far west as Washington County.

In other words, without abandoning its admitted interstate purpose for ME2, Sunoco has obtained approval for intrastate service for the first time across the entire breadth of Pennsylvania.  Sunoco's dizzying array of procedural moves and reversal of course as to its business plans in Pennsylvania in the aftermath of the *Loper* decision were followed by the present declarations of taking seeking extensive portions of Condemnees' private properties in Cumberland County, not York County.  Despite its prior representation that ME2 was an interstate pipeline, Sunoco now claims that it has an intrastate component as well, and, upon that basis alone, has sufficient justification for these takings.

The assertion that ME2 will have several new "on and off" ramp locations so as to ostensibly provide intrastate service, is, at the preliminary hearing stage, insufficient to counter the recent representation Sunoco made to the Court of Common Pleas of York County that ME2 was exclusively interstate.  In order to uphold the invocation of the power of eminent domain, the justification must be genuine and real, not hypothesized, or invented *post hoc* in response to

litigation. *See Middletown Township v. Lands of Stone*, 939 A.2d 331, 338 (Pa. 2007); *see also United States v. Virginia*, 518 US 515, 533 (1996).

Additionally, I am troubled by Sunoco's failure to obtain any PUC recognition that ME2 is within the ambit of the "intrastate" service it now professes it plans to provide, as well as its failure to obtain any certificate of public convenience (CPC) to expressly authorize it to exercise the power of eminent domain. As can be gleaned from the Majority's opinion, Sunoco has cobbled together various CPCs since the 1930's, but never sought a CPC or any other PUC approval granting it the ability to exercise eminent domain within the Commonwealth. Most certainly, Sunoco never sought authority to exercise eminent domain as to ME2. Rather, Sunoco would have this Court confer such power upon it on the basis of vague, non-specific language in a PUC Order dated October 29, 2014, which was entered as part of Sunoco's post-*Loper* procedural posturing. I believe this violates the spirit if not the letter of Section 1104 of the Public Utility Code, 66 Pa.C.S. §1104.

I would also note that the cases cited by the Majority to analogize this case to other instances of concurrent interstate and intrastate activity by business entities are clearly distinguishable in that none of the cases so cited involved the exercise of eminent domain powers to take private property. Private ownership of property is a fundamental right under the U.S. Constitution, and as noted by my colleague, Judge Brobson, in his dissent, a right that is zealously protected under the Pennsylvania Constitution as well. The Majority's decision, I fear, will gravely undermine that right.

Accordingly, I would reverse the trial court's decision and sustain Appellee's preliminary objection that Sunoco is collaterally estopped from re-litigating the interstate nature of ME2. I would also caution Sunoco not to bypass

the PUC should it desire to pursue this matter further and obtain, in the first instance, the proper authority from the PUC to exercise eminent domain powers with respect to ME2 before it targets private property within the Commonwealth and seeks to deprive Commonwealth citizens of their fundamental right to own the same.

_____
PATRICIA A. McCULLOUGH, Judge